UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

TWO SHIPPING CONTAINERS WITH IDENTIFICATION NUMBERS NONU1047916 AND NONU9097390 AND ANY ITEMS CONTAINED THEREIN,

Defendants In Rem.

Civil Action No. 26-CV-120

**UNITED STATES' VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

COMES NOW, Plaintiff, the United States of America, by and through the United States Attorney for the District of Columbia and the Assistant Attorney General for the National Security Division, which alleges as follows and brings this verified complaint for forfeiture in a civil action *in rem* against the defendant property, namely: two mission crew trainers ("MCTs"), which are housed in two shipping containers with identification numbers NONU1047916 and NONU9097390, that were designed and manufactured, using U.S.-origin software and defense technical data, by the Test Flying Academy of South Africa ("TFASA") for the People's Republic of China's ("PRC") People's Liberation Army ("PLA"). The MCTs are mobile classrooms, housed in shipping containers, intended to assist the PLA to train personnel on the use of airborne warning and control system ("AWACS") and antisubmarine warfare ("ASW") aircraft, focused mostly on the capabilities of the U.S. ASW maritime patrol aircraft ("MPA") P-8 Poseidon, manufactured by Boeing.

## NATURE OF ACTION AND THE PARTIES

1. This action arises out of an investigation by the Federal Bureau of Investigation, the Department of Homeland Security, Homeland Security Investigations ("HSI"), and the Department of Commerce ("DOC"), Bureau of Industry and Security ("BIS"), Office of Export Enforcement ("OEE") into the sale and export of sensitive U.S.-origin technologies, technical data, and defense articles to prohibited end users, including components of the PLA, in violation of 50 U.S.C. § 4819 (the Export Control Reform Act ("ECRA")), 22 U.S.C. § 2778 (the Arms Export Control Act ("AECA")), 18 U.S.C. §§1956 (a)(1) (conspiracy to launder monetary instruments), and 554 (smuggling from the United States).

2. The MCTs are subject to forfeiture on several grounds. Because the MCTs constitute property involved in violations of the AECA and smuggling statute, specified unlawful activities under 18 U.S.C. § 1956, they are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A). The MCTs are further subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), as property which constitutes or is derived from proceeds traceable to an offense constituting a specified unlawful activity, that is violations of the AECA and smuggling statute. The MCTs are also subject to civil forfeiture pursuant to 50 U.S.C. § 4820(j), as property, real or personal, tangible or intangible, seized under subsection 50 U.S.C. § 4820(a)(5). Additionally, the MCTs are subject to civil forfeiture pursuant to 22 C.F.R. § 127.6 and 22 U.S.C. § 401 as defense articles exported in violation of the AECA. Finally, the MCTs are also subject to civil forfeiture pursuant to 19 U.S.C. § 1595a(d) as merchandise exported or sent from the United States contrary to law, the proceeds or value thereof, or property used to facilitate the sending of such merchandise.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345 and 1355, and 18 U.S.C. §§ 981(a)(1)(A) and (C).

4. Venue is proper pursuant to 28 U.S.C. §§ 1355(b)(1)(A) and 1391(b)(2) because acts or omissions giving rise to the forfeiture took place in the District of Columbia. Specifically, the parties to the transaction pursuant to which the MCTs and supporting software were designed, manufactured, and exported violated ECRA and the AECA when the parties failed to seek or obtain required licenses from DOC and the Department of State ("DOS"), Directorate of Defense Trade Controls ("DDTC"), as relevant, which are located in Washington, D.C.

5. This Court has *in rem* jurisdiction over the defendant property under 28 U.S.C. 1355(b). Upon the filing of this Complaint, the plaintiff requests that the Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), which the plaintiff will execute upon the property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

## STATUTES

### The Export Control Reform Act

6. The Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730-774, were promulgated by DOC, BIS to regulate the export of goods, technology, and software from the United States. Under ECRA, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any regulation, order, license, or authorization issued pursuant to the statute, including the EAR, according to 50 U.S.C. § 4819.

7. Through the EAR, BIS reviews and controls the export of certain items from the United States to foreign countries in accordance with 15 C.F.R. §§ 734.2-3. BIS places restrictions on the export and reexport of items that it determines could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. Under the EAR, such restrictions depend on several factors, including

the technical characteristics of the item, the destination country, the end user, and the end use of the item.

8. In addition, as part of the EAR, BIS maintains the Entity List (15 C.F.R. Part 744, Supp. No. 4), which is a U.S. government list of foreign persons (including individuals, companies, and organizations) that are deemed a national security concern and subject to specific licensing requirements for export and reexport of certain goods, software, and technology. Each entity on the Entity List is assigned a specific licensing requirement on the basis of the national security and/or foreign policy considerations associated with the entity's designation on the Entity List. Within the Entity List, the information for each listed entity includes the license requirement, license review policy, and Federal Register citation(s). License requirements vary from "all items subject to the EAR" – which includes items designated as EAR99 – to all items on the Commerce Control List (CCL), or to all items on the CCL except for specified items.

9. As discussed more fully below, the Test Flying Academy of South Africa and several of its affiliates have been added to the Entity List by BIS. Consequently, an export license is required to export any item subject to the EAR (i.e., including software classified as EAR99) to TFASA or the other listed affiliates. Applications for such export licenses are reviewed under a presumption of denial. BIS's licensing authority is located in Washington, D.C.

<u>The Arms Export Control Act</u>

10. It is a crime to willfully export, attempt to export, or conspire to export defense articles and defense services from the United States to a foreign location without a license or other written authorization from the Department of State. 22 U.S.C. § 2778; 22 C.F.R. § 127.1.

11. “Defense articles” are defined in the AECA’s attendant regulations, the International Traffic in Arms Regulations (ITAR), as any item or technical data designated on the United States Munitions List (USML). 22 C.F.R. § 120.31.

12. “Technical Data” is defined in the ITAR, in relevant part, as information that “is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance, or modification of defense articles” and software directly related to defense articles. 22 C.F.R. § 120.33(a)(1), (4).

13. “Defense services” are defined in the ITAR as the furnishing of assistance (including training) to any foreign person, whether in the United States or a foreign country, in the design, development, engineering, manufacture, production, assembly, testing, repair, maintenance, modification, operation, demilitarization, destruction, processing or use of “defense articles.” 22 C.F.R. § 120.32(a)(1). Defense services also include the “[m]ilitary training of foreign units and forces, regular and irregular, including formal or informal instruction of foreign persons in the United States or abroad or by correspondence courses, technical, educational, or information publications and media of all kinds, training aid, orientation, training exercise, and military advice.” 22 C.F.R. § 120.32(a)(3).

14. The USML includes such items as anti-submarine warfare trainers and technical data directly related to defense articles (*e.g.*, anti-submarine warfare trainers). 22 C.F.R. § 121.1 (USML Category IX). The USML further includes aircraft and related technical data that bear an original military designation of A, B, E, F, K, M, P, R, or S (*e.g.*, the Boeing P-8 Poseidon aircraft) or foreign-origin aircraft specially designed to provide functions equivalent to aircraft with original military designation of A, B, E, F, K, M, P, R, or S. 22 C.F.R. § 121.1 (USML Categories VIII).

Technical data directly related to sonar equipment and Electro-Optical and Infra-red Cameras (EO/IR) systems also is controlled. USML 22 C.F.R. § 121.1 (Categories XI(d), XII(f)).

15. "Export" is defined in the ITAR as an actual shipment or transmission of a defense article from the United States, including by sending or taking a defense article out of the United States in any manner. 22 C.F.R. § 120.50(a)(1). "Reexport" is defined as (1) an actual shipment or transmission of a defense article from one foreign country to another foreign country, including the sending or taking of a defense article to or from such countries in any manner; (2) Releasing or otherwise transferring technical data to a foreign person who is a citizen or permanent resident of a country other than the foreign country where the release or transfer takes place (a deemed reexport); or (3) Transferring registration, control, or ownership of any aircraft, vessel, or satellite subject to this subchapter between foreign persons. 22 C.F.R. § 120.51.

16. In addition, the ITAR controls items into which a defense article is incorporated. Specifically, "[d]efense articles described on the USML are controlled and remain subject to [the ITAR] following incorporation or integration into any item not described on the USML." 22 C.F.R. § 120.11(c). This could include, for example, technical data on the USML that is incorporated into software subject to the EAR.

17. The U.S. government prohibits exporting or reexporting defense articles and defense services to China under the AECA and the ITAR, and it does not issue licenses or other approval for such exports. 22 C.F.R. § 126.1(d)(1). DDTC's licensing authority is located in Washington, D.C.

Smuggling

18. Pursuant to 18 U.S.C. § 554, it is a crime for any person to fraudulently or knowingly export or send from the United States, or attempt to export or send from the United

States, any merchandise, article, or object contrary to any law or regulation of the United States or receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States.

Money Laundering

19. Title 18, United States Code, Section 1956(a)(2)(A) criminalizes transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer a monetary instrument or funds to a place in the United States, from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity. Title 18, United States Code, Section 1956(h) criminalizes conspiracies to do the same.

20. Pursuant to 18 U.S.C. § 1956(c)(7)(D), the term "specified unlawful activity," includes violations of 18 U.S.C. § 554 and the AECA.

Forfeiture Statutes

21. Pursuant to 18 U.S.C. §§ 981(a)(1)(A), any property, real or personal, which is involved in a violation of 18 U.S.C. § 1956 is subject to criminal and civil forfeiture. In addition, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to any offense constituting "specified unlawful activity" is subject to criminal and civil forfeiture.

22. As noted above, the term "specified unlawful activity," includes violations of the AECA and 18 U.S.C. § 554.

23. Pursuant to 22 C.F.R. § 127.6, any defense article that is intended to be or is being or has been exported or removed from the United States in violation of law, such article and any

vessel, vehicle, or aircraft involved in such attempt is subject to seizure, forfeiture, and disposition to the United States as provided under 22 U.S.C. § 401.

24. Pursuant to 22 U.S.C. § 401, the United States may seize and detain any commodity (other than arms or munitions of war) or technology which is intended to be or is being exported in violation of laws governing such exports and may seize and detain any vessel, vehicle, or aircraft containing the same or which has been used or is being used in exporting or attempting to export such articles. Furthermore, all arms or munitions of war and other articles, vessels, vehicles, and aircraft seized pursuant to this subsection shall be forfeited.

25. Pursuant to Title 19, United States Code, Section 1595a(d), any merchandise exported or sent from the United States or attempted to be exported or sent from the United States contrary to law, or the proceeds or value thereof, and property used to facilitate the exporting or sending of such merchandise, the attempted exporting or sending of such merchandise, or the receipt, purchase, transportation, concealment, or sale of such merchandise prior to exportation shall be seized and forfeited to the United States.

26. Pursuant to 50 U.S.C. § 4819(d)(1)(A)-(C), 18 U.S.C. § 981(a)(1)(A), and 28 U.S.C. § 2461(c), a violation of 50 U.S.C. § 4819 subjects the following to forfeiture: any property used or intended to be used, in any manner, to commit or facilitate an offense in violation; any property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956; and any property constituting an item or technology that is exported in violation this subchapter. Further, pursuant to 50 U.S.C. § 4820(j), any property, real or personal, tangible or intangible, seized under 50 U.S.C. § 4820(a) shall be subject to forfeiture to the United States in accordance with the procedures set forth in section 981 of Title 18.

27. Pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and 22 U.S.C. § 401, a violation of the AECA (22 U.S.C. § 2778) subjects the following to forfeiture: any property, real or personal, which constitutes or is derived from proceeds traceable to any offense constituting "specified unlawful activity;" and all arms or munitions of war and other articles, vessels, vehicles, and aircraft seized. Again, the term "specified unlawful activity," includes violations of the AECA.

28. Seizures are appropriate from this district, because at least one of the predicate acts giving rise to forfeiture occurred in Washington, D.C., as described below.

## PROBABLE CAUSE

### Relevant Individuals and Entities

29. **TFASA (a/k/a, Pearl Coral 1173 CC dba TFASA):** TFASA was a South Africa-based company that specialized in military flight testing and training through facilities in South Africa and China. TFASA was founded in 2003 with the support of the South African government to facilitate cooperation with China. According to its website, "TFASA Flight Test Services" trained Chinese military pilots for fixed wing and rotary wing aircraft to North Atlantic Treaty Organization ("NATO") training standards. As described further below, TFASA was added to the Entity List in June 2023 for providing training to Chinese military pilots using U.S. and NATO sources.

30. **Aviation Industry Corporation of China ("AVIC"):** AVIC was a Chinese defense conglomerate responsible for China's government-run aviation sector and was the primary domestic supplier of military aircrafts to the PLA.

31. **AVIC International Flight Training Academy ("AIFA"):** AIFA is a flight school based in South Africa. Based on its website, AIFA maintained a lengthy business

relationship with TFASA. AIFA was added to the Entity List in June 2023 for providing training to Chinese military pilots using U.S. and NATO sources.

32. **Beijing FoundFresh Technology Company Limited ("Foundfresh"):** Foundfresh was a Chinese entity established in or around November 2017, which, as discussed below, was referred to by TFASA variously as a China-based agent of TFASA or TFASA's client. Foundfresh regularly served as an intermediary between TFASA and the PLA and was listed on end user paperwork generated during the transport of the MCTs.

33. **Livingston Aerospace Ltd. ("Livingston"):** Livingston was an aviation firm based in the United Kingdom. As of October 2024, the director of Livingston was a TFASA Program Manager, a former Royal Air Force fighter pilot, and a graduate of the U.S. Navy Test Pilot School ("USNTPS"). Livingston was added to the Entity List on July 3, 2024, for its links to TFASA and the training of China's military forces using Western and NATO sources

34. **PLA Naval Air Force ("PLANAF"):** PLANAF is the naval aviation branch of the PLA.

**Summary**

35. TFASA, through its employees, agents, contractors, and other persons and entities (collectively, "the co-conspirators") unlawfully exported U.S.-origin goods, software, and technology from the United States to South Africa for use by TFASA and other companies on the Entity List and then incorporated U.S. defense technical data into the MCTs for further unlawful export to China.

36. Specifically, as detailed below, before and after TFASA was added to the Entity List in June 2023, the co-conspirators purchased U.S.-origin flight simulator software (the "FS

Software"), which was subject to the EAR, from a U.S. company[1] and exported it to TFASA in South Africa without a required license from the DOC, in furtherance of TFASA's work for the PLA. The co-conspirators then incorporated U.S.-origin defense technical data, namely, technical data related to the Boeing P-8 Poseidon aircraft ("P-8 Poseidon"), into the FS Software, making the FS Software ITAR-controlled technical data that was then incorporated into the MCTs. As a result, the MCTs were defense articles intended to provide a defense service (i.e., training of the PLA, a foreign military).

37. The co-conspirators exported the FS Software from the United States to TFASA without a license from DOC in violation of 50 U.S.C. § 4819 (ECRA) and 18 U.S.C. § 554 (smuggling from the United States) and exported and reexported the ITAR-controlled MCTs to China without a license from DDTC in violation of 22 U.S.C. § 2778 (AECA).

38. The co-conspirators purchased the FS Software by transferring funds from a place outside the United States to the U.S. company's bank account in the United States. Such payments were made to promote a specified unlawful activity – namely, violations of the AECA and the smuggling statute – in violation of 18 U.S.C. § 1956(h) (conspiracy to launder monetary instruments).

**TFASA's work on Behalf of the Chinese Military and Entity Listing**

39. The PLA has targeted current and former military personnel from NATO nations and other Western countries to help bolster the PLA's capabilities.[2] The PLA has further used private companies in South Africa and China, such as TFASA, to hire former fighter pilots from Western nations, including the United States, Canada, France, Germany, the United Kingdom, and

[1] This U.S. company is referred to below as "U.S. Company B."
[2] *See Safeguarding our Military Expertise*, June 2024, https://www.dni.gov/files/NCSC/documents/products/Safeguarding_Our_Military_Expertise.pdf.

Australia, to train PLA Air Force and Navy aviators and improve the PLA's military air operations capabilities while gaining insight into Western air tactics, techniques, and procedures.[3]

40. On June 12, 2023, the DOC added TFASA and numerous of its subsidiaries and affiliates in South Africa and elsewhere, including AIFA, to the Entity List "for providing training to Chinese military pilots using Western and NATO sources," which the DOC determined was "contrary to U.S. national security and foreign policy interests." Livingston was added to the Entity List on July 3, 2024, for the same reasons. As explained above, the addition of these entities to the Entity List institutes a license requirement to export any item, including software designated as EAR99, that is subject to the EAR to TFASA or the other listed entities. Applications for such export licenses are reviewed under a presumption of denial.

41. TFASA responded to its addition to the Entity List with the following statement on its webpage on or about June 13, 2023, "the United States Department of Commerce has added TFASA to a list of entities subject to export administration regulations. As a South African company, registered with the South African National Conventional Arms Control Committee (NCACC), and not reliant on US exports, this change does not affect TFASA'S day to day operations." TFASA further wrote, "TFASA will be contacting the United States Department of Commerce to clarify its position."

42. In or around July 2023, a month after being added to the Entity List, TFASA incorporated "Global Training Solutions Limited" in Hong Kong.

**"Project Elgar"**

43. In early 2019, TFASA began exploring the production of MCTs for the PLA. TFASA referred to its MCT project for the PLA as "Project Elgar." As noted above, the MCTs

[3] *See id.*

were mobile classrooms housed in shipping containers, intended to assist the PLA train personnel on the use of airborne warning and control system ("AWACS") and antisubmarine warfare ("ASW") aircraft, focused mostly on the capabilities of the U.S. ASW maritime patrol aircraft ("MPA") P-8 Poseidon, manufactured by Boeing.

44. The purpose of the MCTs was to provide ASW training to a PLA air crews — both to improve the PLA's own capabilities and to better counter the U.S. military. Such training, in an environment which allowed PLA aviators to hone their tactical skills prior to engaging in a real-world engagement with an adversary (i.e., U.S.) naval vessel, would increase their proficiency at detecting and tracking enemy vessels. As stated in the "Mission Aircraft Generic Simulator & Part Task Trainer & Operation Training" document that was in the possession of several TFASA personnel:

> Of all the activities undertaken by mission aircraft it may be considered that the practice of ASW is of primary importance. The ability to conduct ASW effectively is a fragile and perishable skill that requires regular and frequent practice. In the real-world[,] encounters with submarines are rare and often fleeting.
>
> In the MCT[,] encounters with submarines are guaranteed allowing extended exposure so that tactics and procedures can be conducted allowing more effective use of real-world submarine time when it is encountered.
>
> Through regular and frequent exposure existing tactics may be refined and improved, and new tactics and procedures can be developed and refined far more quickly than would otherwise be the case. The MCT enhances operational development as well as increasing proficiency.

45. Beginning in at least mid-2019, individuals associated with TFASA began discussing implementation of Project Elgar, with one individual describing the development of the MCTs as "a fairly massive project which TFASA are still busy negotiating.... Basically a

simulation of a whole bunch of different sensors, think of something like the Boeing P-8 Poseidon." TFASA's work on Project Elgar continued for the next five years.

46. Throughout the construction of the MCTs, TFASA's Project Elgar team emphasized replicating the P-8 Poseidon's capabilities, including incorporating the FS Software into the MCTs to provide realistic experiences via synthetic displays, such as the simulation of radar and sonobuoys and the monitoring of the same.[4] This detailed and realistic simulation was done to satisfy "the customer's [i.e., the PLA's] fixation with the [Boeing] P-8 [Poseidon]."

47. TFASA's Project Elgar team was so focused on replicating the look, feel, and capabilities of the Boeing P-8 Poseidon that they constructed and installed consoles in the MCTs "along the lines of the [read crew] P-8 consoles." Using publicly available photos of the P-8 Poseidon, such as Image 1 below, TFASA's Project Elgar team carefully determined what parts of the consoles would be replicated by the FS Software and which parts could be physically constructed in order "to fit 12 consoles in a 40ft [shipping] container."

[4] Sonobuoy is an expendable sonar device dropped from an aircraft or ship to detect underwater sounds from submarines and other vessels. It is a crucial component of an ASW aircraft.



*Image 1*

48. While attempting to replicate the P-8 Poseidon's technical capabilities, TFASA's Project Elgar team repeatedly emphasized the purpose of the MCTs was to train the PLANAF. According to one 52-page document titled "Mission Aircraft Generic Simulator & Part Task Trainer & Operation Training" and maintained by TFASA's Project Elgar team, "The PLANAF are currently seeking to modernize the fleet across a number of disciplines including Maritime Patrol Aircraft and Helicopters (MPA, MPH[[5]])." Under the heading "1.2 Hongdu Request," the document stated, "At the recent meeting (Sep 17) in China, TFASA was requested to scope the outline and requirement and provide cost estimates." Within the document were photos of Chinese military aircrafts, including the Y8 GX6, which performs ASW duties for the PLA. The photos below, Image 2 and Image 3, were included in the document:

[5] MPH refers to maritime patrol helicopters, which perform tasks over water, such as ASW.



*Image 2* *Image 3*

49. The co-conspirators also discussed the technical parameters required for effective training software. For example, the co-conspirators focused considerable attention on the audio frequency generated by a ship's propeller (sometimes referred to as the "prop rate"), which would allow a sonar operator to identify the class or type of ship. The specificity achieved by the software was detailed, with displays that allowed for prop rate harmonics at 16, 32, and 48 hertz, allowing the trainee using the software to learn how operators classify the source vessel.

50. In another 10-page document titled "MCT Progress Report – July 2022," TFASA provided a progress update on building the MCTs. The progress report discussed development work on the FS Software, including sonobuoy modelling, steps taken to meet the simulators' operational requirements, target modelling, and modelling for inverse synthetic-aperture radar ("ISAR"), a radar technique used to generate two-dimensional, high-resolution images of a target. These software development steps were likely required to satisfy the training requirements of the Chinese military end users.

51. The progress report further noted that "[t]he containers to house the MPA and MPH MCT have been acquired"; "The computer hardware has been acquired"; and "The hardware for mounting the computer and display has been designed and Building is in progress." Images 4

through 10, inserted below, and the accompanying descriptions, were included in the progress report. Images 9 and 10 represent screenshots of the software designed for the MCTs.



*Image 4:* Container after Modification and Prior to Console Installation.



*Image 5:* Example Computer Unit



*Image 6:* Example Console Units.




*Image 7:* Example CAD of Internal Layout



*Image 8:* Example Console with Monitors.



*Image 9:* Ship Motion Sample




*Image 10:* Submarine Motion Sample

52. Other photos, such as Images 11 and 12 (included below), documented construction progress on the MCT as described in the progress report and show the building and installation in the shipping containers of consoles closely mimicking those found in the Boeing P-8 Poseidon. As seen in Image 11, one of the containers is identified as NONU9097390.




*Image 11* *Image 12*

53. By the fall of 2022, the co-conspirators continued to provide updates on the MCT development, including modifications to the FS Software concerning the tactical display, weapons control panel, "torpedo…flight crew launch button," and anti-surface missiles.

54. In May 2023, TFASA employees prepared for a Chinese delegation visit to South Africa. TFASA's Project Elgar team also welcomed a new member who would serve as an instructor on the MPA/MPH MCTs. According to a TFASA employee, this new member had a military background in MPA and planned to use the MPA/MPH MCTs to refresh his abilities and become an expert in using the MCTs "so that he can impress the client when the end-user party [i.e., representatives of the PLA] visits ZA[[6]]."

55. According to a TFASA employee, the May/June "Client Visit to MCTs" would include 12 individuals: one manager from AVIC-I, one manager from China Flight Test Establishment ("CFTE"), and 10 "uniformed personnel" consisting mainly of engineers. According to open-source information, CFTE is also known as the AVIC Flight Test Center and

[6] ZA is the abbreviation for the Dutch name of South Africa, "Zuid-Afrika."

is "China's only national-level organization qualified to conduct validations and flight tests for aviation products, including military and civilian aircraft, aero engines and airborne equipment."[7]

56. A later description of the Chinese "MCT [v]isit" viewed it as "[t]echnical training and practical training in the use of the [MCT] equipment" and to perform an "[a]cceptance review" of the MCTs. According to a TFASA employee, the Chinese delegation consisted of "military tourists, their main aim is seeing ZA."

57. Despite the close relationship between TFASA and its PLA customer, significant distrust also existed. With respect to the same Chinese delegation visit, a TFASA employee told the Project Elgar team that the delegation must not be allowed to keep any materials produced by TFASA prior to payment: "If they get hands on manuals, source codes, or anything useful before they pay for it we lose leverage in trying to get them to pay for the MCTs. Do not let them get their hands on the source code until they have paid for it. Please secure the software in each MCT such that TTL can prevent uncontrolled access until the devices have been paid for and we have money in the bank."

**Purchase of FS Software from U.S. Companies A and B**

58. In or around 2019, members of TFASA's Project Elgar team purchased FS software on behalf of TFASA from U.S. Company A, a developer of an advanced flight simulator. Based on U.S. Company A business records, these individuals originally purchased the U.S. Company A software for $750 in or around November 2019. In or around December 2019, TFASA's Project Elgar team contacted U.S. Company A with questions about how to operate the software without

---

[7] The Global Times is owned by the People's Daily Press, which is a publishing house directly governed by the Central Committee of the Chinese Communist Party. *See* https://www.globaltimes.cn/page/202207/1270026.shtml#:~:text=Founded%20in%201959%2C%20the%20Chinese,reads%20the%20establishment's%20self%2Ddescription.

an internet connection. In response, U.S. Company A employees explained that a USB drive would be necessary to run the software without an internet connection. As the TFASA team's request, U.S. Company A sent a USB drive to one of TFASA's South African locations, later identified as TFASA's physical address in the announcement of its addition to the Entity List.

59. Between 2022 and 2024, TFASA's Project Elgar team purchased FS Software from U.S. Company B. U.S. Company B's FS Software can be modified from its base configuration to simulate advanced military aircrafts, including fighter jets, helicopters, transport aircraft, and other vehicles. Such modifications could be purchased directly from U.S. Company B or could be made by a competent software developer with knowledge of the relevant vehicle platform.

60. According to U.S. Company B, the base level FS Software is subject to the EAR. U.S. Company B further explained that, depending on the aircraft (e.g., civilian or military), further modifications sold by U.S. Company B (e.g., U.S. Company B's high-fidelity F-16 fighter jet simulator) are controlled under the ITAR. There were three variants of Company B's FS Software for version 6 - Personal, Pro and Pro +. The capabilities of the software were the same, with Pro and Pro + providing the end users with more tools to modify the FS Software's flying environment, in addition to allowing greater interoperability with other programs/software that were added into Company B's FS Software. The FS Software was available via License and Developer License formats, with the License Format costing $350 and giving the owner access forever. The Developer License was less expensive and with access provided upon monthly payment.

61. TFASA's Project Elgar team purchased the following FS Software from U.S. Company B on or about the below dates:

| Purchase Date | Product | Cost |
|---|---|---|
| April 9, 2022 | FS Software v4 Professional (Developer) | $9.95 |

| | | |
|---|---|---|
| August 11, 2022 | FS Software v4 Professional (Developer) | $9.95 |
| August 31, 2022 | FS Software v5 Professional (License) | $199 |
| April 5, 2023 | FS Software Professional (Developer) | $59.70 |
| July 20, 2023 | FS Software v6 Professional (Developer) | $9.95 |
| August 29, 2023 | FS Software v6 Professional (Developer) | $9.95 |
| October 23, 2023 | FS Software v6 Professional (License) | $350 |
| July 7, 2024 | FS Software v6 Professional (License) | $350 |

62. Based on business records received from U.S. Company B, TFASA's Project Elgar team used a Visa/Mastercard credit card to purchase the FS Software and identified a third company, Vanand, as the purchaser of the software. A member of TFASA's Project Elgar team described Vanand as a company with an "off the shelf name, Vanand Trading 1002 C", but clarified that the "main regular client is a company called TFASA - Test Flying Academy of South Africa who train test pilots.... TFASA have a contract now to train crew to use the various sensors used in an ASW aircraft."

63. After purchasing the software from U.S. Company B, TFASA's Project Elgar team outsourced aspects of the FS Software development to software developers around the world, including developers in Italy, South Africa, Namibia, South Africa, and the United States. In discussions with developers, TFASA's Project Elgar team repeatedly referenced and described the FS Software's military application, including describing the work as involving implementing a simulation environment for training ASW crew, such as the crew operating a Boeing P-8 Poseidon. According to TFASA's Project Elgar team, the FS Software would simulate the various sensors – such as sonobuoys, MAD (Magnetic Anomaly Detection), EO/IR, radar, and relevant displays that

the crew would use for each of the sensor types – in order for trainees to experience a simulated environment where they could detect, track, and identify ships and submarines.

64. The MCT project goal continued to be creating a high-fidelity replica of the Boeing P-8 Poseidon aircraft. For example, members of TFASA's Project Elgar team shared demo videos with the contracted software developers in order to assist in simulating the P-8's capabilities. An image from one such video, produced below, shows an image of a Boeing P-8I sensor display, which matches the consoles being built in the shipping containers shown above.




*Image 13*

65. Throughout 2022 and 2023, TFASA's Project Elgar team continued to update each other on the status of the FS Software development project, which by 2023 included simulated versions of the Ohio Class U.S. submarine, U.S. aircraft carriers, U.S. guided missile cruisers, U.S. destroyer, Chinese destroyers, U.S. "combat ships," and the USS Fort Worth, a U.S. Navy Freedom-class littoral combat ship. Again, the detail incorporated into the FS Software was substantial. For example, the ISAR images for submarines could simulate the submarines at various levels of submersion, including how much of the submarine was above the water when fully surfaced.

66. By early 2024, TFASA's Project Elgar team was sharing additional screenshots of the FS Software displays, such as samples from the ASW electronic warfare display, reproduced

below in Images 16 and 17. The "Track Number" refers to a specific vessel or aircraft, while the "Platform Details" provide additional information on the vessel or aircraft. Additional information is then available under a different view. In the examples below, Track Number 1234 is identified on the electronic warfare display as a "hostile" U.S. Navy guided missile cruiser armed with SM-1 surface-to-air or anti-ship missiles.

| Track Number | Category | Course/ Speed | Platform Details |
|---|---|---|---|
| 1234 | ◊ | 005/10 | SM-1 Range XX<br>Fitted to XX<br>Other information |
| 2345 | ○ | 040/15 | Merchant Ship |
| | | | |
| | | | |

*Image 14*

| Track 1234 | Classification | Parameter List | Platform Details |
|---|---|---|---|
| Warship | Hostile | SM-1<br>PRF<br>PW<br>Scan Type | AAW Cruiser<br>Weapons<br>Sensors |

*Image 15*

67. By April 2024, TFASA's Project Elgar team reported that the software developers had finished all the required software functionality for the MCT project.

**MCT's Shipment to China and Detention by DOC**

68. On or about September 29, 2024, the MCTs (housed in Container Numbers NONU1047916 and NONU9097390) were exported from South Africa to China onboard a vessel belonging to COSCO SHIPPING Lines Co., Ltd. ("COSCO," the Chinese state-owned maritime transportation company). The proforma bill of lading provided to COSCO listed the description of

good as "AS PER SHIPPER'S DECLARATION: SHIPPER-OWNED CONTAINERS CONVERTED INTO CLASSROOMS."

69. On or about October 27, 2024, the MCTs arrived in Singapore en route to China, where U.S. authorities took lawful possession of them. The following photographs depict the inside of one of the containers at that time, including a reference to "Elgar" on a blackboard.



*Image 16*




*Image 17*




*Image 18*

70. On or about December 17, 2024, the MCTs left Singapore, arriving in the United States on or about January 7, 2025.

71. The Shipping Containers NONU1047916 and NONU9097390, which housed the MCTs, contained multiple items, including Intel and Microsoft hardware, Nvidia GEFORCE RTX graphics processing units, and Dell monitors, as well as a LG UHD 4K Monitor.

72. Analysis of the electronics found in Shipping Containers NONU1047916 and NONU9097390 (the defendant property) indicate US Company B's software was present on the

devices and had been removed prior to shipment of the MCTs. Analysis of the hardware found during the search also included files and/or user profiles with the following titles:

a. elgar
b. ASW
c. ASWRelease
d. ASWLauncher
e. C:\ASW\Sonar\SonarSim\run_windows.bat
f. C:\Users\elgar\Desktop\ASWLauncher – Shortcut.lnk
g. Computer Simulation of Search Tactics for Magnetic Anomaly Detection.pdf
h. Sonar Audio Generation.ipynb
i. USDestroyer.obj
j. USGuidedMissileCruiser.obj
k. USAssaultShip.obj
l. Sonar Equations.ipynb
m. ISAR.ipynb
n. USAircraftCarrier.obj
o. Chinese052Destoroyer.obj

**<u>TFASA's Failure to Obtain a License from DDTC and DOC</u>**

73. The DOC's BIS provided a License Determination for the FS Software version 6. According to BIS, during the period described in this Complaint, the software was classified as EAR99 (and therefore subject to the EAR) and, after at least June 12, 2023, would have required a license to export to TFASA. As noted above, because of TFASA's addition to the Entity List, a license is required to export any item subject to the EAR to TFASA.

74. Based on a check of BIS records on or about December 15, 2025, neither TFASA nor the other co-conspirators described herein obtained a license from BIS.

75. DDTC's Office of Defense Trade Controls Policy ("DTCP") provided an assessment regarding the relevant export controls in connection with the MCTs and associated software during the period described in this Complaint. Specifically, DTCP determined that the MCTs "were and are defense articles subject to the jurisdiction of the Arms Regulations (ITAR)

(22 CFR parts 120-130). U.S. Munitions List (USML) Category IX(a)(7) described 'anti-submarine warfare trainer,' which these articles satisfied."

76. Similarly, the associated software "was and is technical data subject to the jurisdiction of the Department of State in accordance with the ITAR. USML Category IX(e)(1) described 'technical data . . . directly related to the defense articles enumerated in paragraphs (a) and (b) of … USML Category IX' which this article satisfied." As a result, for both the MCTs and associated software, "Pursuant to the ITAR, a license or other approval was and is required prior to any export from, or temporary import into, the United States."

77. Based on record checks on or about October 25, 2024, neither TFASA nor any other co-conspirator described herein obtained a license from DDTC.

**Knowledge of Export Laws**.

78. Throughout the FS Software development and construction of the MCTs, TFASA employees acknowledged TFASA's addition to the Entity List and referenced other export regimes that applied to their work. Several examples are set out below.

79. In or around October 2019, TFASA's employees, agents, and representatives were discussing the "fuzzy grey line" between what is legal and not legal business, specifically with respect to Project Elgar "crossing ITAR boundaries."

80. Similarly, in or around February 2022, a TFASA employee called attention to a U.S. export control warning on U.S. Company B website advertising the FS Software. The TFASA employee specifically noted that the FS Software was subject to U.S. export control laws, which would limit the entities that TFASA could provide it to.

81. In or around August 2023, TFASA attempted to procure a training aircraft for use in an unspecified military training course. A portion of the financing for the aircraft came from a

separate South African company ("SA Company 2"). However, after TFASA's and Livingston's additions to the Entity List, SA Company 2 informed Livingston that SA Company 2 was "hereby withdrawing financial support for the above project [i.e., the training aircraft purchase]" because of U.S. law.

82. A representative from Livingston shared the SA Company 2 notice with TFASA, saying, "This just in. F#@ck. B@st@rd 'Americans [sic]. Any suggestions mist [sic] welcome. I say again, fuck!!"

83. In addition, TFASA's Project Elgar team discussed licensing requirements in connection with the MCTs themselves, including telling a Foundfresh employee that TFASA needed a South African export permit for the MCTs. The application for the export permit required an end user contract and an end user certificate of registration.

84. In or around November 2023, TFASA's Project Elgar team submitted an "Application for Permit to Market Armaments and/or Services" to the South African government, Director Conventional Arms Control Inspectorate, on behalf of TFASA. In the application, TFASA wrote: "TFASA is registered with the NCACC (Certificate No: MS 1-22-0002628) and is providing advanced aviation training services to clients in China. TFASA developed Mission Crew Training (MCT) devices which can help in the training of Crew Resource Management during Anti-Submarine Warfare and Airborne Early Warning operations."

**COUNT ONE—FORFEITURE**
**18 U.S.C. § 981(a)(1)(A)**

85. The United States incorporates by reference the allegations set forth in Paragraphs 1 through 84 above as if fully set forth herein.

86. The Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in a transaction or attempted transaction in violation of section 1956, and a violation of U.S. export controls implemented pursuant to the AECA and smuggling.

**COUNT TWO—FORFEITURE**
**18 U.S.C. § 981(a)(1)(C)**

87. The United States incorporates by reference the allegations set forth in Paragraphs 1 through 84 above as if fully set forth herein.

88. The Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) as property, real or personal, which constitutes or is derived from proceeds traceable to a violation of U.S. export controls implemented pursuant to the AECA and smuggling.

**COUNT THREE—FORFEITURE**
**22 C.F.R. § 127.6 & 22 U.S.C. § 401**

89. The United States incorporates by reference the allegations set forth in Paragraphs 1 through 84 above as if fully set forth herein.

90. The Defendant Property is subject to forfeiture pursuant to 22 C.F.R. § 127.6 as a defense article that is intended to be or is being or has been exported or removed from the United States in violation of law, such article and any vessel, vehicle, or aircraft involved in such attempt is subject to seizure, forfeiture, and disposition to the United States as provided under 22 U.S.C. § 401.

**COUNT FOUR—FORFEITURE**
**19 U.S.C. §§ 1595a(d)**

91. The United States incorporates by reference the allegations set forth in Paragraphs 1 through 84 above as if fully set forth herein.

92. The defendant property is subject to forfeiture pursuant to 19 U.S.C. § 1595a(d) as merchandise exported or sent from the United States contrary to law, the proceeds or value thereof, or property used to facilitate the sending of such merchandise.

* * *

**PRAYER FOR RELIEF**

WHEREFORE, the United States prays that all persons who reasonably appear to be potential claimants with interests in the defendant property be cited to appear herein and answer the Complaint; that the defendant property be forfeited and condemned to the United States of America; that upon Final Decree of Forfeiture, the United States Marshal dispose of the defendant property according to law; and that the plaintiff have such other and further relief as this Court deems proper and just.

Dated: January 15, 2026
Washington, D.C.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: /s/ *Steven Wasserman*
Steven B. Wasserman
Assistant United States Attorney
D.C. Bar Number 453251
National Security Section
United States Attorney's Office
601 D. Street, N.W.
Washington, D.C. 20530
(202) 252-7719
Steven.Wasserman@usdoj.gov

JOHN A. EISENBERG
ASSISTANT ATTORNEY GENERAL

By /s/ *Sean R. Heiden*

Sean R. Heiden
D.C. Bar No. 1617636
Trial Attorney
U.S. Department of Justice
National Security Division
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
(202) 514-8106
sean.heiden2@usdoj.gov

* * *

**VERIFICATION**

I, Brent Talaga, a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 15th day of January, 2026.

Brent Talaga
_________________________________
Special Agent Brent Talaga
Homeland Security Investigations